## Case No. 1,148.

### The BAY STATE.

[Abb. Adm. 235; [1] 6 N. Y. Leg. Obs. 198.]

District Court, S. D. New York. April Term, 1848. [2]

COLLISION—EXTRAORDINARY PRECAUTIONS IN HARBOR—SAILING VESSEL IN FOG—SIGNALS—CUSTOM OF LONG ISLAND SOUND.

1. A steam vessel running into harbor, or through the common thoroughfare of other vessels, is bound to take extra precaution against collision with sailing vessels; and in the night, or in case of a fog, must move with great circumspection, or even lay-to or anchor, according to the danger of encountering other vessels.

[Cited in The Rocket, Case No. 11,975.]

2. A sailing vessel at anchor or lying-to in a dark night or in a dense fog, is also bound to take such precautions as may be in her power, to give warning of her position to other vessels, whether steamers or vessels under canvas, which may be nearing her.

3. Under the usages of navigation upon Long Island sound, the blowing a horn, the ringing a bell, or the beating upon an empty barrel or upon an anchor, is a reasonable precaution which a sailing vessel lying-to in a fog is bound, as towards a steamer which may come in collision with her, to take, in warning off such steamer. (Since reversed.)

[Cited in Jones v. The Hanover, Case No. 7,466. Disapproved in The Rockaway, 19 Fed. 452.]

[See note at end of case.]

4. The rule of equal contribution should be applied in cases of damage caused by a collision for which both colliding vessels are mutually in fault.

[Cited in The Atlas, Case No. 633; The Comet, Id. 3,050; Vanderbilt v. Reynolds, Id. 16,839.]

In admiralty. This was a libel in rem, by Goldsmith Wells and others, owners of the schooner Oriana, against the steamboat Bay State, to recover damages for a collision between those vessels. [Decree for libelant. This was afterwards reversed by the circuit court in The Bay State, Case No. 1,150. The decree of the circuit court was affirmed by the supreme court in McCready v. Goldsmith, 18 How. (59 U. S.) 89.]

Francis B. Cutting, for libellants.
Daniel Lord, for claimants.

BETTS, District Judge. The facts directly pertinent to the merits of this case are these:

[1] [Reported by Abbott Brothers.]
[2] [Reversed in Case No. 1,150, and that decree affirmed in 18 How. (59 U. S.) 89.]

—The schooner Oriana, laden with coal, on a trip to New Bedford, was, at six o'clock, on the morning of August 13, 1847, at a point distant about six miles to the southeast of Watch Hill light, and about thirty-five miles from Newport. She had her sails up and was under way, but there was nearly an entire calm, and the vessel was making little or no progress through the water. There was a dense fog at the time, so thick that vessels could not be seen a distance beyond one hundred to two hundred feet off.

The steamboat Bay State had lain-to on account of the fog at Mount Hope, and left Newport between three and four o'clock, a. m., that morning. She was running at the rate of sixteen miles the hour, and came within one hundred to one hundred and fifty feet of the schooner before discovering her.

So soon as the steamer was discerned from the schooner, the crew of the latter cried out with all their force, and the cry was indistinctly heard on the steamer. The steamer was then pointing to about midships the schooner. Her engine was stopped as quickly as possible, her helm thrown aport, and all the sheer given her that the space permitted. She struck the schooner on her larboard quarter, twelve or fourteen feet from her stern; the schooner sank in a few minutes, and with her cargo was a total loss. The vessels were in effect on the open sea, being east of Block Island, and in the lower part of Narragansett bay, with nothing intervening on the east and south between them and the ocean.

It is the practice of this steamboat to run in the open parts of her passage, through fogs, at her full speed, determining her position by her course and time. On this occasion, the master and two pilots were in the wheelhouse, keeping a look-out, and a man was stationed at the large bell of the boat to ring it from time to time in warning to other vessels. The bell had been rung immediately before the collision. It was proved that the beating of her wheels, on the approach of the steamer, could be heard on the water, in a calm, fourteen or fifteen miles, and in ordinary weather from six to seven miles. The large bell is heard usually from one to four miles.

The schooner had anchored the night previous about four miles from Watch hill, on account of the fog, and lay there until 5 a. m. of this day. She was got under way with a light breeze, and ran by compass E. by N. about 20 minutes; and the breeze then having died away, she was hove to, heading S. S. E., the water being free from swell, and smooth. She lay about 20 minutes, when the steamer was seen approaching her from the eastward, about one hundred feet off. During the night, while at anchor, persons were kept on her deck, beating with sticks on empty hogsheads, at short intervals, to give warning to other vessels. The testimony shows that noises from pounding on empty casks and anchors on board vessels are heard in the night time, or in a fog, on board steamers under way, a sufficient distance off to enable them to keep clear of vessels giving the signal. In this case, it was proved that those on board the schooner heard the steamer approaching fifteen minutes before the collision.

It has been repeatedly decided that vessels propelled by steam, and running into a harbor, or through a common thoroughfare of other vessels, will be held chargeable with the consequences of collisions, when kept at high speed during the night, or in weather so thick that objects in their way cannot be discerned at a distance sufficient to afford time to escape them. Bullock v. The Lamar, [Case No. 2,129;] The Perth, 3 Hagg. Adm. 414; The Rose, 2 W. Rob. Adm. 1; The Neptune, [Case No. 10,120.]

No blame is, however, to be implied against steamers who use their full power out on the high seas, and when there is no indication of other vessels in their track, and when no circumstances are known to them importing the necessity of extraordinary caution.

The place of the disaster in question partook of both characters. It was strictly on the open sea, on the ocean, as distinguished from the navigation of the Sound; but it was only a few miles from land, and in the range of vessels seeking ports in Rhode Island or Massachusetts from the Sound, or coming into the Sound from those places, or going out to, or coming in from the sea.

The master of the steamboat is chargeable with knowledge of these facts, and he would have been bound to take proper precautions against meeting or overtaking sailing vessels in that vicinity, if the wind had been sufficient to enable them to run with their sails. Then the darkness and obscurity from fog would impose on him the necessity of moving with great circumspection, and so as to be enabled to stop or change the direction of his boat in the shortest time, or he might be required to lay her to, or anchor her, according to the danger or probability of encountering other vessels in motion. In such case, he could not discharge himself of all obligation to further care and watchfulness, by merely rendering the steamboat motionless. He would be bound to exercise every reasonable and appropriate means at his command to prevent other vessels running upon his, to warn them of his position by ringing his bell, blowing off steam, or giving other notice that would be equally advantageous to them. The same principles must apply to the conduct of all vessels.

A sailing vessel at anchor, or lying-to in a dark night in a harbor, or where other vessels may be expected to pass, must show a light, or collisions with her will be imputed to that neglect. When the darkness is occasioned by mist or fog, and a light will not aid to designate her position, there would seem to devolve upon her the duty of using cor-

·respondent means, for instance, as was done by the schooner the night before the collision, to give notice by noises sufficient to reach other vessels nearing her.

If, then, the schooner, at the time of the collision, is to be regarded as on the ocean, and excused from giving warning to other vessels in that position, the steamer would be equally freed from her obligation to keep at a low speed, and would be entitled to run as on the high seas, and a collision between the two vessels, under such circumstances, would be a common misfortune and an accident, without blame to either party.

But, in my judgment, this is a case of clear fault in both parties. The schooner lying-to in a calm, and having heard the steamboat approaching her for fifteen minutes, and knowing she was not discoverable from her by sight, was bound to give warning by such noises as might probably reach the steamer. She was not driven to devise something to that end in sudden alarm and confusion. She had passed the night in the use of the very precaution adapted to the occasion, and it was only necessary to repeat it on this emergency. Upon the evidence of the pilots and mates of the steamboat, that like noises were frequently heard by them in fogs, and the steamer was thus enabled to govern its course safely, it is fair to presume this accident might have been thus wholly prevented.

It was manifestly hazardous to run the steamboat in that state of the weather, when the darkness prevented her seeing any object more than a hundred yards ahead, and at a speed so great that with every exertion of her powerful engine she could not be stopped on the water in less than four or five minutes' time, during which her momentum must probably force her ahead a quarter or one third of a mile.

The doctrine commonly accepted and applied in this court is, that the libellant cannot recover for a collision, if it appear to have been caused in any manner by his own misconduct or fault, although he shows the other vessel to have been in fault also, (The Emily, [Cases Nos. 4,453, 4,452;] Abb. Shipp. 303, note 1,) and that the rusticum judicium recognized in many high authorities, which apportions the loss equally between both parties, (3 Kent, Comm. 231; Abb. Shipp. 305,) applies only to cases where it is undiscoverable upon the proofs where the blame actually lies. This is, however, the first case which has occurred in this court, where the question was distinctly propounded, whether in case of collision and loss of property by the mutual fault of both parties, the rule of contribution should be applied.

I confess myself better satisfied with the familiar doctrine of the common law, that in cases where both parties are to blame, no recovery of damages can be had by either. Kent v. Elstob, 3 East, 18; Vanderplank v. Miller, Moody & M. 169. The English admiralty has, however, distinctly laid down the opposite rule. The Woodrop-Sims, 2 Dod. 83. And that case has been constantly adhered to since. Abb. Shipp. 230; Story, Bailm. § 608a, note.

Judge Story regards it the settled law of modern maritime states, and he traces it to a high antiquity in the continental codes. Story, Bailm. §§ 608, 610. And it has been recognized in several American decisions of respectable character and weight. Reeves v. The Constitution, [Case No. 11,659;] Rogers v. The Rival, [Id. 11,867;] The Scioto, [Id. 12,508.] The case of Strout v. Foster, 1 How. [42 U. S.] 92, admits, by implication, the existence and validity of the rule, although that point was not embraced within the decision; and in the case of Waring v. Clarke, 5 How. [46 U. S.] 503, Mr. Justice Woodbury adverts to the rule of contribution between vessels, both of which were culpable, as one of the settled modes of exercising admiralty jurisdiction in cases of collision. The question, what is the proper rule of damages in such cases, is one deserving the solemn adjudication of our highest tribunal; but until it may be finally settled there, I shall adopt the rule of apportionment indicated in the authorities cited, and shall, accordingly, decree that a valuation of the schooner and cargo be made, and that the libellants recover one half that value. No costs are to be taxed by either party against the other.

The ordinary order would be, that the loss of both parties from the collision be valued, and that the equal moiety be borne by each; but the decree may be more simple and direct in this case, as there is no proof that the steamer received any injury. Decree accordingly.

NOTE, [from original report.] The case was appealed to the circuit court,—The Bay State, [Case No. 1,150,]—where it was held, as in the district court, that the steamer was shown to be in fault in her manner of navigating. But it was further held, that the proofs in the cause did not warrant the court to say, that as matter of fact, there was a usage of blowing horns, &c., on board of sailing vessels becalmed in a fog, under which the schooner was bound to take such precautions in warning off the steamer. The decree was, therefore, reversed, as to the point that the schooner was herself in part to blame; and a decree ordered for the libellants for the full amount of their damages. This reversal of the decision reported in our text, has been by some of the profession understood to proceed upon the ground, that as between a sailing vessel or steamer approaching in a fog, the whole duty of precaution to avoid collision rests upon the steamer, and the sailing vessel is free from obligation to employ any means or methods of giving notice of her proximity. We suggest, however, that the decision in the circuit court, fairly construed, goes no further than to hold that, as matter of fact, the evidence in the case showed that none of the precautions suggested as having been within the power of the sailing vessel — blowing horns, beating empty barrels, &c.—would have been of any practical avail in notifying the steamer of the danger; and so, that the sailing vessel was not to be held guilty of negligence in failing to employ means of notice, which, if employed, would in all probability have done no good. The general principle that a sailing

vessel, aware of the approach of a steamer in darkness or fog, and having at command adequate means of giving notice of her proximity, is bound to use those means, does not seem to us to be impugned by the decision in the circuit court. She is not, however, it would seem, guilty of negligence in failing to use means, which it appears would be insufficient if used. The decree of the circuit court was affirmed by the supreme court, in December, 1855, upon the grounds assigned in the circuit court. The case in the supreme court is reported under the title of McCready v. Goldsmith, 18 How. [59 U. S.] 89. [See note at end of Case No. 1,150.]